## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Receipt number AUSFCC-6650176

|  |  |
|---|---|
| CHEVRON U.S.A. INC., <br> TEXACO DOWNSTREAM PROPERTIES INC., <br> AND UNION OIL COMPANY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | No.    20-1784 C |

## COMPLAINT

1.      Plaintiffs Chevron U.S.A. Inc., Texaco Downstream Properties Inc., and Union Oil Company of California (collectively, the "Oil Companies") bring this action against the United States, under the Contract Settlement Act of 1944 ("CSA") and the Tucker Act, for damages for breach of contract arising from the Oil Companies' cleanup of wartime pollution.

2.      This case arises out of the Government's failure to indemnify the Oil Companies for environmental response costs that they incurred due to the production of high-octane aviation gasoline ("avgas") on behalf of the United States during World War II ("WWII"). The Government promised to indemnify these costs in exchange for the Oil Companies' commitment to produce unprecedented quantities of avgas to defeat the Axis Powers. Yet, decades later, the United States reneged on its promises, leaving the Oil Companies stuck holding the bill for tens of millions of dollars spent in investigation and remediation costs that, by the terms of the Oil Companies' contracts with the Government, must be borne by the United States.

3.      In *Shell Oil Co. v. United States*, 751 F.3d 1282, 1290–96 (Fed. Cir. 2014), the Court of Appeals for the Federal Circuit, considering contractual language identical to the

language in the Oil Companies' contracts, held that the United States must indemnify environmental remediation costs that are materially identical to those the Oil Companies incurred here. And in a follow-up decision, the Federal Circuit held that the United States must pay *all* response costs—like those at issue in this case—that are "directly related to the initial reaction used to create avgas under the Avgas Contracts," *Shell Oil Co. v. United States*, 896 F.3d 1299, 1309 (Fed. Cir. 2018). These two Federal Circuit decisions dictate the result in this case—the United States is liable for breaching its obligations under the contracts, and the Oil Companies must be awarded all damages sought herein.

## JURISDICTION

4.     The United States Court of Federal Claims has jurisdiction over this matter pursuant to the Contract Settlement Act of 1944, 41 U.S.C. § 113(b) (2010) (partially repealed 2011),[1] and the Tucker Act, 28 U.S.C. § 1491(a).

## THE PARTIES

5.     Plaintiff Chevron U.S.A. Inc. ("Chevron U.S.A.") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in San Ramon, California.

---

[1] "In 2011, the CSA was [partially] repealed and replaced by An Act To Enact Certain Laws Relating To Public Contracts, Pub. L. 111–350, 124 Stat. 3677. The 2011 Act contained a savings clause providing that, '[t]he laws . . . are repealed except for *rights and duties that matured,* penalties that were incurred, and proceedings that were begun before the date of enactment of this Act.' Pub. L. No. 111–350, § 7(b), 124 Stat. 3677, 3855 (2011) (emphasis added). Consequently, . . . the Oil Companies['] right to be reimbursed for environmental remediation costs under the Avgas Contracts matured prior to 2011," and "the Oil Companies may still recover for interest on the environmental remediation costs they have incurred." *Shell Oil Co. v. United States*, 130 Fed. Cl. 8, 39 n.42 (2017), *aff'd* 896 F.3d 1299 (Fed. Cir. 2018); *see also Shell Oil Co. v. United States*, 148 Fed. Cl. 781, 793–95 (Fed. Cl. 2020). Accordingly, the CSA applies to the Oil Companies' claims, notwithstanding the 2011 partial repeal, and all references herein to the CSA are from the 2010 edition of the United States Code.

6.      Chevron U.S.A. is the successor-in-interest to the Gulf Oil Corporation with respect to Gulf Oil Corporation's WWII contracts with the United States for avgas from its Port Arthur, Texas refinery. In 1985, the Gulf Oil Corporation changed its name to Chevron U.S.A. Inc. as part of a merger.

7.      Plaintiff Texaco Downstream Properties Inc. ("Texaco Downstream") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Ramon, California.

8.      Texaco Downstream is the successor-in-interest to the Tidewater Associated Oil Company with respect to Tidewater Associated Oil Company's WWII contracts with the United States for avgas from its Avon, California refinery. In 1956, Tidewater Associated Oil Company changed its name to Tidewater Oil Company. In 1967, Tidewater Oil Company merged with and into the Getty Oil Company. As part of a corporate reorganization in conjunction with Skelly Oil Company's merger into Getty Oil Company, Getty Oil Company contributed all of its refining and marketing assets including all refining, marketing, and transportation related contracts into its wholly-owned subsidiary, Getty Refining and Marketing Company. In 1984, in conjunction with the acquisition of Getty Oil Company by Texaco, Inc. through a reverse merger, Getty Refining and Marketing Company changed its name to Texaco Refining and Marketing, Inc. In 2001, as part of a corporate reorganization in conjunction with the acquisition of Texaco Inc. by Chevron Corporation through reverse merger, the refining assets and liabilities previously held by Texaco Refining and Marketing, Inc. were contributed into Texaco Downstream.

9.      Plaintiff Union Oil Company of California ("Union") is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Ramon, California.

3

10.    Union is the successor-in-interest to The Pure Oil Company, with respect to The Pure Oil Company's WWII contracts with the United States for avgas from its Smith's Bluff refinery in Nederland, Texas. In 1965, The Pure Oil Company merged with Union.

11.    The defendant is the United States of America.

## FACTUAL ALLEGATIONS

### Background

12.    In the aftermath of the attack on Pearl Harbor on December 7, 1941, aviation gasoline became "the most critically needed refinery product" and "was essential to the United States' war effort." *Shell Oil Co.*, 751 F.3d at 1285. Accordingly, "the Government recognized the need to quickly mobilize avgas production." *Id.* at 1286. To accomplish that objective, the United States, via the Defense Supplies Corporation ("DSC"), entered into contracts with the Oil Companies or their predecessors-in-interest to produce avgas.

13.    The United States used these contracts in conjunction with wartime agency orders and directives to direct and control many aspects of the production of avgas and keep up with wartime demands. The Government's control was comprehensive: it ordered refiners to participate in the avgas program, set production quotas for each refinery, regulated the movement of feedstock between refineries, controlled day-to-day refinery scheduling, determined the amount of crude oil allocated to each refinery, dictated avgas specifications, asserted approval authority over all refinery projects (including pollution control projects), directed the method of delivery, and, of particular import here, the Government set the price of avgas, imposing stringent limits on profits that the Oil Companies could earn.

14.    In exchange for imposing those conditions—and to incentivize the Oil Companies to invest significantly in the production facilities and the research required to drastically ramp up

4

the production of avgas, when such incentive would otherwise be lacking—the United States agreed to compensate the Oil Companies for all of their expenses and indemnify the Oil Companies for the costs imposed on them resulting from any later-enacted laws, including the costs of cleaning up wastes associated with the wartime production of avgas.

15.     Industry-wide, "avgas production increased over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945[, when Japan formally surrendered to the Allied forces], and was crucial to Allied success in the war." *Shell Oil Co.*, 751 F.3d at 1287. The fulfillment of this gigantic task was described by some military and government officials as "one of the great industrial accomplishments in the history of warfare." The Tidewater Assoc. Oil Co., Annual Report 1945 at 1. As was true in *Shell Oil*, here, "[t]he Oil Companies held up their end of the bargain," *Shell Oil Co.*, 751 F.3d at 1287, and now the United States must do the same.

### The Contracts Forming the Bases of This Action

16.     The Avgas Contracts listed below—collectively referred to as the "Avgas Contracts"—form the bases for this action and are identical in all relevant respects:

    a.     On August 10, 1942, Gulf Oil Corporation, a predecessor-in-interest to Chevron U.S.A., entered into a contract with the United States, through the DSC, for the sale and purchase of large volumes of avgas. A true and correct copy of the contract is attached as Exhibit A.

    b.     On March 26, 1942, Tidewater Associated Oil Company, a predecessor-in-interest to Texaco Downstream, entered into a contract with the United States, through the DSC, for the sale and purchase of large volumes of avgas. A true and correct copy of the contract is attached as Exhibit B.

c.      On June 10, 1942, Tidewater Associated Oil Company, a predecessor-in-interest to Texaco Downstream, entered into a contract with the United States, through the DSC, for the sale and purchase of large volumes of avgas. A true and correct copy of the contract is attached as Exhibit C.

d.      On February 18, 1943, Tidewater Associated Oil Company, a predecessor-in-interest to Texaco Downstream, entered into a contract with the United States, through the DSC, for the sale and purchase of large volumes of avgas. A true and correct copy of the contract is attached as Exhibit D.

e.      On May 19, 1943, Tidewater Associated Oil Company, a predecessor-in-interest to Texaco Downstream, entered into a contract with the United States, through the DSC, for the sale and purchase of large volumes of avgas. A true and correct copy of the contract is attached as Exhibit E.

f.      On July 20, 1942, The Pure Oil Company, a predecessor-in-interest to Union, entered into a contract with the United States, through the DSC, for the sale and purchase of large volumes of avgas and/or avgas base stock. A true and correct copy of the contract is attached as Exhibit F.

g.      On April 15, 1944, The Pure Oil Company, a predecessor-in-interest to Union, and the United States, through the DSC, agreed to an amendment to their July 20, 1942 contract for the sale and purchase of large volumes of avgas and/or avgas base stock. A true and correct copy of the contract is attached as Exhibit G.

17.      As detailed *supra*, in a series of mergers, acquisitions, and other forms of corporate reorganizations, Chevron U.S.A., Texaco Downstream, and Union succeeded to the respective

interests of Gulf Oil Corporation, Tidewater Associated Oil Company, and The Pure Oil Company in the above-referenced Avgas Contracts by operation of law.

18.    The United States Government Services Administration ("GSA") is the successor-in-interest to DSC.

19.    The Avgas Contracts each included an indemnification provision that provided as follows:

> Buyer shall pay[,] in addition to the prices as established in [earlier provisions of the contract], any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.

Exhibit A at 17; Exhibit B at 13; Exhibit C at 16; Exhibit D at 15–16; Exhibit E at 16–17; Exhibit F at 13 (emphases added). Avgas was the "commodit[y] delivered" under the Avgas Contracts. *See Shell Oil Co.*, 751 F.3d at 1290 (defining an identical provision—"commodities delivered"—to mean avgas in a similar wartime contract).

20.    In addition to this risk-shifting indemnification provision, the Avgas Contracts also limited the Oil Companies to profits of 6–7 percent. This was a profit margin far lower than what the commercial market would bear. "[B]y setting only a 6–7% profit margin for the sale of avgas, [the Government] was aware that the Oil Companies had to maximize revenues from all non-avgas petroleum by-products or be at risk of having to ask the Government to increase their profit margins." *Shell Oil Co.*, 896 F.3d at 1309–10.

21.    Moreover, maximizing avgas or avgas base stock production necessarily required the Oil Companies to maximize the production of non-avgas by-products because, *inter alia,* only a relatively small fraction of any given barrel of crude oil could be used to produce avgas or avgas base stock, which meant—as the Federal Circuit found in *Shell Oil*—that any waste generated by

these non-avgas by-products was "directly related to the initial reaction used to create avgas under the Avgas Contracts." *Id.* at 1309.

22.     Thus, both because of the profit structure of the Avgas Contracts and the chemistry of petroleum engineering, all waste generated by the Refineries during their respective periods of performance under the Avgas Contracts was "attributable to the Avgas Contracts," as the Federal Circuit concluded in *Shell*. *Id.*

23.     The Oil Companies performed all relevant duties under the Avgas Contracts, producing millions of barrels of avgas under the direction of the United States. The Oil Companies in this matter and others in the industry played a major role in WWII—without their extraordinary efforts to ramp up the production of essential materials, the struggle against Axis forces would have been far more difficult.

24.     Chevron U.S.A.'s Avgas Contract was for avgas production at its Port Arthur Refinery in Port Arthur, Texas ("Port Arthur Refinery"); Texaco Downstream's Avgas Contracts were for avgas production at its Avon Refinery in Martinez, California ("Avon Refinery"); and Union's Avgas Contracts were for avgas and/or avgas base stock production at its Smith's Bluff Refinery in Nederland, Texas ("Smith's Bluff Refinery") (collectively referred to as the "Refineries" or each "Refinery").

25.     The United States terminated the Avgas Contracts at the conclusion of WWII.

**The Port Arthur Refinery (Claimant: Chevron U.S.A.)**

26.     The Port Arthur Refinery occupies approximately 3,800 acres in Port Arthur, Texas, in the southeast corner of Texas, approximately five miles from the Texas-Louisiana border. Houston is approximately 90 miles to the east and the Refinery is bisected by State Highway 87. The processing area south of Highway 87 (South Plant) encompasses the Refinery's

original footprint, which has been operating since 1901. The area north of Highway 87 (North Plant) opened in 1918 to refine crude oil and produce gasoline and other products. The Refinery is partially bordered by wetlands and wildlife management areas, including the Intracoastal Waterway and Sabine Lake on the southeast.

27.     The Port Arthur Refinery devoted its operations to meeting the demands of the Government during WWII. Gulf Oil, a Chevron U.S.A. predecessor-in-interest, began expanding its Port Arthur refinery facilities at the request of the Government, just prior to finalizing its contracts with the Government. Gulf Oil committed to "adjust their affairs to war conditions and to make their facilities fully available to the Government in whole-hearted cooperation with the war program," resulting in greatly increased crude oil processing and expansion of facilities for the storage and production of essential war products. *See* Gulf Oil Corp., 1944 Annual Report at 3. By 1945, nearly all the Refinery's production was dedicated to supporting the war effort.

28.     In October 1943, the Refinery produced about 2,000 barrels per day of avgas. *See* Application for Priority Assistance WPB-617, Serial No. 114267, Gulf Oil Corporation, Port Arthur, Texas (Oct. 14, 1943). After Refinery expansions planned with the Government, the Refinery was expected to increase its avgas production to 11,588 barrels per day. *See id.* In April 1945, Gulf Oil requested War Production Board approval for facilities at Port Arthur that would increase avgas production to 14,000 barrels per day. *See* Gulf Oil Corporation Project Priority Request No. 286, Application for a Necessity Certificate No. NC-9127 at 1 (Apr. 6, 1945).

29.     The Government's mandate to maximize and increase production of avgas for the war effort resulted in the generation and disposal of large amounts of waste at and around the Port Arthur Refinery site. Chevron U.S.A. has incurred significant response costs—more than $15 million—remediating waste at the Port Arthur Refinery that was generated and/or deposited in

connection with WWII avgas production. Under the contracts governing the Port Arthur Refinery's production of avgas for the Government, the United States must indemnify Chevron U.S.A. for these costs.

### The Avon Refinery (Claimant: Texaco Downstream)

30.    The Avon Refinery is located approximately three miles east of Martinez, California. It occupies approximately 2,100 acres and is located on a low ridge that trends north-northeast and merges to the east with a flat area of former marshlands and tidal flats. The Avon Refinery is surrounded by bodies of water and/or wetlands to the north, west, and east.

31.    The Avon Refinery's WWII operations were devoted to the Government's needs. During the war years, Tidewater Associated Oil Company, a Texaco Downstream predecessor-in-interest, rapidly expanded the Avon Refinery. By the end of the war, it was one of the largest refineries on the West Coast, ranking ninth among 56 refineries in the United States in the manufacture of 100-octane avgas and third in the capacity of oil it could produce. The expansions were necessary to meet the Government's demands for unprecedented quantities of 100-octane avgas.

32.    Almost the entire output from the Avon Refinery during the war years was for the defense program. As Tidewater Associated Oil Company management noted in a 1943 letter,

> While all of the war programs of the petroleum industry are of importance, the Office of Petroleum Administration for War has recently stressed that the one program which must take precedent over all others is that of producing the maximum quantity of aviation gasoline and components thereof, regardless of economic considerations.

Letter from H.Y. Hyde, Tidewater Assoc. Oil Co., to Mr. R.G. Follis, Aviation Gasoline Subcomm. for Dist. No. 5 at 7 (Sept. 2, 1943). The Avon Refinery ultimately supplied more than 13.5 million barrels of avgas to Allied forces.

33.     The Government's mandate to maximize and increase production of avgas for the war effort resulted in the generation and deposit of large amounts of waste at and around the Avon Refinery site. Texaco Downstream has incurred significant response costs—more than $47 million—remediating waste at or around the Avon facility that was generated and/or deposited in connection with WWII avgas production. Under the contracts governing the Avon Refinery's production of avgas for the Government, the United States must indemnify Texaco Downstream for these costs.

**The Smith's Bluff Refinery (Claimant: Union)**

34.     The Smith's Bluff Refinery occupies approximately 565 acres in Nederland, Texas, and is located at 3900 Highway 366, approximately a quarter mile from the intersection of Highway 366 and Highway 347. The northern border of the property boundary is formed by the Neches River; the western, eastern, and southern boundaries of the property abut developed and undeveloped industrial property.

35.     During WWII, the Pure Oil Company, predecessor-in-interest to Union, devoted its efforts to meeting the extraordinary demands of the Government, launching its largest refinery construction program in the company's history at that time to fulfill the Government's mandate to maximize the production of avgas. Pure Oil spent more than $16 million to build new facilities and refining equipment primarily for the production of war products. *See* The Pure Oil Company, 1943 Annual Report at 7. By 1946, the processing units built or expanded at the Smith's Bluff Refinery to facilitate the production of quantities of avgas required by the Government included a number of catalytic cracking units, an alkylation plant, a polymerization plant, a naphtha plant, a cold acid plant, a sulfuric acid alkylation unit, gasoline agitators, blending infrastructure, and a gas recovery unit. The expansion at Smith's Bluff yielded strategic dividends for the Allied war effort.

By 1943, the estimated volume of Grade 130 avgas produced at the Smith's Bluff Refinery increased to 3,620 barrels per day. *See* Application for Priority Assistance, Serial No. 116346 (amendment), Pure Oil Company, Smith's Bluff, Texas (Nov. 12, 1943).

36.     The Government's mandate to maximize and increase production of avgas and avgas base stock for the war effort resulted in the generation and deposit of large amounts of waste at and around the Smith's Bluff Refinery site. Union has incurred significant response costs—more than $3 million—remediating waste at and around the Smith's Bluff Refinery that was generated and/or deposited in connection with WWII avgas production. Under the contracts governing the Smith's Bluff Refinery production of avgas for the Government, the United States must indemnify Union for these costs.

**Federal and State Directives Requiring Remediation**

37.     Thirty-five years after the Oil Companies performed the Avgas Contracts with the United States, in 1980, the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") was enacted, and in 1984, the federal Hazardous and Solid Waste Amendments to the Resource Conservation and Recovery Act ("RCRA") followed.

38.     "CERCLA generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed." *United States v. Shell Oil Co.*, 841 F. Supp. 962, 968 (C.D. Cal. 1993) (quotation marks omitted), *aff'd*, 294 F.3d 1045 (9th Cir. 2002).

39.     Among other directives in connection with Chevron U.S.A.'s Port Arthur Refinery, the Natural Resource Trustees invoked Section 107 of CERCLA to enter into a Consent Decree with Chevron U.S.A., which approved certain natural resource damage assessment work undertaken by Chevron U.S.A. and ordered restoration work and reimbursement of the Trustee's

oversight costs. That order was entered by the United States District Court for the Eastern District of Texas (Beaumont Division) on March 30, 2005.

40.    In connection with Texaco Downstream's Avon Refinery, in 1993 Texaco Inc. on behalf of itself and its subsidiaries (including Texaco Refining and Manufacturing, Inc., a successor-in-interest to Tidewater Associated Oil Company and a predecessor-in-interest to Texaco Downstream, *see supra* at ¶ 8) settled litigation brought by one former owner/operator of the Avon Refinery under Section 113 of CERCLA for the costs of environmental investigation and remediation at and from the Avon Refinery arising from historic releases of hazardous substances, including releases during the period of Refinery operations under the Avgas Contracts.

41.    In general, RCRA mandated the clean closing or retrofitting of surface impoundments and the banned land disposal of hazardous waste. These requirements were self-implementing by operation of law, and some were additionally imposed by compliance orders from the U.S. Environmental Protection Agency or authorized state agencies.

42.    Under RCRA, beginning in the late 1980s, the Oil Companies were required to expend (and did expend) substantial sums on environmental investigations of the Refineries and remediation for waste at or released from the Refineries attributable to the Avgas Contracts. Further, California and Texas enacted their own state environmental statutes prohibiting discharges and releases of pollutants and waste. These states' statutes provided authority to compel environmental investigations, remediation, and the cessation of discharges at the Refineries. In addition, various directives and amendments have been issued by state environmental regulators pursuant to state law compelling the Oil Companies to conduct environmental clean ups of the Refineries and the areas surrounding them. The costs of these clean-up efforts have been borne by the Oil Companies, but they are the contractual responsibility of the United States.

43.   The following is a non-exclusive list of such directives, under which the Oil Companies have spent millions of dollars in response costs.

a.   **Port Arthur Refinery (Claimant: Chevron U.S.A.):** Texas Natural Resources Conservation Commission ("TNRCC," now the Texas Commission on Environmental Quality), Order No. 97-0404-IHW-E pursuant to its RCRA authority under the Texas Solid Waste Management Act (May 1997) (requiring RCRA facility investigation, interim corrective measures, and corrective measures); U.S. Environmental Protection Agency Administrative Order on Consent No. VI-001(h)-97-H (Sept. 1997) (RCRA § 3008(h) corrective action regarding construction and closing of CAMU for historic sludge and soil contamination); and CERCLA Natural Resource Damage Consent Decree (Civ. No. 1:05-cv-21) (E.D. Tex. Mar. 30, 2005) (approving certain NRD assessment work and ordering restoration and past cost reimbursement).

b.   **Avon Refinery (Claimant: Texaco Downstream):** California Regional Water Quality Control Board (San Francisco Division) Resolution 576 to Tidewater Oil Company (July 16, 1964) (prescribing requirements and prohibiting twelve separate waste discharges into Suisun Bay, Walnut Creek, and Hastings Slough and onto land near the Avon refinery); U.S. Environmental Protection Agency, Region IX, RCRA Interim Status Corrective Action Administrative Order No. 09-89-0013A regarding the Avon refinery (Sept. 6, 1990) (requiring RCRA facility investigation); California Regional Water Quality Control Board (San Francisco Division)

Order Nos. 92-078, 93-079, and 99-083 regarding the Avon Refinery (requiring investigations and remediations).

c.   **Smith's Bluff Refinery (Claimant: Union):** TNRCC issued a notice of violation to the Smith's Bluff Refinery in 1989 that resulted in Phase I and II investigations and targeted interim remedial actions. Based on these investigations, TNRCC issued an April 1994 Consent Order. No. 94-0141-SWR-E and a June 2002 Amended Consent Order that required comprehensive hydrocarbon and solid waste management unit corrective actions.

The Oil Companies were required to pay by federal or state law—and did pay—all the environmental investigation and remediation costs at the Refineries that are claimed herein.

44.   In 2014, the Federal Circuit interpreted an avgas contract materially identical to those contracts at issue here and held that "[t]he plain language of the new or additional charges provision thus requires the Government to indemnify the Oil Companies for CERCLA costs incurred 'by reason of' the avgas contracts." *Shell Oil Co.*, 751 F.3d at 1293. Thus, the type of environmental investigation and remediation costs the Oil Companies have incurred are covered by the indemnification provision of the Avgas Contracts.

45.   Federal Circuit precedent also establishes that the Government is responsible for indemnifying all costs from waste that is "directly related to the initial reaction used to create avgas under the Avgas Contracts." *Shell Oil Co.*, 896 F.3d at 1309. Because all waste generated by the Refineries during their period of performance under the Avgas Contracts was "directly related to the initial reaction used to create avgas [or avgas base stock] under the Avgas Contracts," the

Government must indemnify the Oil Companies for the costs of remediating their WWII waste, plus 2.5 percent simple interest under the CSA.

**Damages Claimed in This Action**

46.     The Oil Companies have incurred three categories of costs and interest for which the United States is liable under the Avgas Contracts and the CSA.

47.     First, the Oil Companies have to date incurred investigation and response costs at the Refineries in approximately the following amounts, with the final amounts (through the date of trial) to be determined at trial:

> Chevron U.S.A.: $15 million
>
> Texaco Downstream: $47 million
>
> Union: $3 million

48.     Second, the Oil Companies have incurred "reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract," 41 U.S.C. § 106(d)(3) (2010). These are costs incident to the preparation of the Oil Companies' written demand for findings, submitted in June 2020. Such costs amount to approximately $2 million to be proved at trial. This amount is to be paid to the Oil Companies in proportion to the remediation costs to which they are entitled, as reflected below (subject to adjustment once final response cost damages are assessed):

| Oil Company | Proportion of Remediation Costs | Amount Incurred for Costs settling the Terminated War Contracts |
|---|---|---|
| Chevron U.S.A. | 23.08% | $461,600 |
| Texaco Downstream | 72.31% | $1,446,200 |
| Union | 4.61% | $92,200 |

49.     Third, the Oil Companies have incurred "interest on the amount due and unpaid . . . at the rate of 2 ½ per centum per annum." 41 U.S.C. § 106(f) (2010); *see id.* § 106(d)(6) (2010). This interest—which applies to both categories of costs described above—will continue to run until "the date of final payment" by the United States of the Oil Companies' response and claim-preparation costs.

50.     The Oil Companies will continue to incur environmental response costs at the Refineries well into the future. Regardless of the amount, the United States is legally obligated to indemnify the Oil Companies for 100 percent of future investigation/remediation costs at the Refineries that are attributable to avgas production under the Avgas Contracts, and pay the Oil Companies 2.5 percent simple interest from the time the costs are incurred through the date of final payment of those costs by the United States.

51.     On June 8, 2020, the Oil Companies submitted to the United States (acting through the Administrator of the U.S. General Services Administration ("GSA")) a written demand for findings pursuant to Section 13(a) of the CSA. 41 U.S.C. § 113(a) (2010). The United States received the written demand no later than June 9, 2020. On September 8, 2020, GSA denied the claim. The Oil Companies bring this suit pursuant to Section 13 (b) & (c)(2) of the CSA, which permits a contractor that is aggrieved by the findings of the contract administrator to file suit in this Court "within ninety days after delivery to him of the findings by the contracting agency." 41 U.S.C. § 113(c)(2) (2010).

## COUNT I: BREACH OF CONTRACT
## PORT ARTHUR REFINERY (CHEVRON U.S.A.)

52.     Plaintiffs re-allege and incorporate by reference Paragraphs 1–51.

53.     Pursuant to the indemnification provision in the Avgas Contract attached as Exhibit A, the United States has a duty to indemnify the Oil Companies for investigation and

remediation costs incurred by reason of production of avgas. The Federal Circuit concluded such duty exists in its interpretation of an identical provision in the United States' wartime avgas contract with another refiner. *See Shell Oil Co.*, 896 F.3d at 1316; *Shell Oil Co.*, 751 F.3d at 1296. Under this binding precedent, the United States must indemnify the Oil Companies for 100 percent of the remediation costs that they have incurred as a result of their respective periods of performance under the Avgas Contract, plus 2.5 percent simple interest running until the date of payment.

54.    Chevron U.S.A. or its predecessor-in-interest has incurred and will continue to incur investigation and remediation costs at Port Arthur in response to state and federal directives, and interest will continue to accrue on those costs until paid.

55.    The United States, through the DSC's successor-in-interest, the GSA, has failed to honor its indemnification obligations to Chevron U.S.A., the relevant successor-in-interest to Gulf Oil Corporation.

56.    Chevron U.S.A. or its predecessor-in-interest fully performed its duties under the Avgas Contract. The only remaining relevant duties of performance under the Avgas Contract are the duties of the United States to indemnify Chevron U.S.A. for investigation and remediation costs incurred by reason of the production, manufacture, sale, or delivery of the commodities delivered under the Avgas Contract.

57.    The United States' failure to indemnify Chevron U.S.A. for such costs and interest materially breaches the Avgas Contract, and Chevron U.S.A. is entitled to recover in damages all remediation costs and interest that it claims from the United States.

58.    Chevron U.S.A. is also entitled to recover "reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war

contract," 41 U.S.C. § 106(d)(3) (2010), plus 2.5 percent simple interest running until the date of payment.

## COUNT II: BREACH OF CONTRACT
## AVON REFINERY (TEXACO DOWNSTREAM)

59.    Plaintiffs re-allege and incorporate by reference Paragraphs 1–51.

60.    Pursuant to the indemnification provisions in the Avgas Contracts attached as Exhibits B-E, the United States has a duty to indemnify the Oil Companies for investigation and remediation costs incurred by reason of production of avgas. The Federal Circuit concluded such duty exists in its interpretation of an identical provision in the United States' wartime avgas contract with another refiner. *See Shell Oil Co.*, 896 F.3d at 1316; *Shell Oil Co.*, 751 F.3d at 1296. Under this binding precedent, the United States must indemnify the Oil Companies for 100 percent of the remediation costs that they have incurred as a result of their respective periods of performance under the Avgas Contracts, plus 2.5 percent simple interest running until the date of payment.

61.    Texaco Downstream or its predecessor-in-interest has incurred and will continue to incur investigation and remediation costs at Avon in response to state and federal directives, and interest will continue to accrue on those costs until paid.

62.    The United States, through the DSC's successor-in-interest, the GSA, has failed to honor its indemnification obligations to Texaco Downstream, the relevant successor-in-interest to Tidewater Associated Oil Company.

63.    Texaco Downstream or its predecessor in interest fully performed its duties under the Avgas Contracts. The only remaining relevant duties of performance under the Avgas Contracts are the duties of the United States to indemnify Texaco Downstream for remediation

19

costs incurred by reason of the production, manufacture, sale, or delivery of the commodities delivered under the Avgas Contracts.

64.     The United States' failure to indemnify Texaco Downstream for such costs and interest materially breaches the Avgas Contracts, and Texaco Downstream is entitled to recover in damages all investigation and remediation costs and interest that it claims from the United States.

65.     Texaco Downstream is also entitled to recover "reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract," 41 U.S.C. § 106(d)(3) (2010), plus 2.5 percent simple interest running until the date of payment.

## COUNT III: BREACH OF CONTRACT
## SMITH'S BLUFF REFINERY (UNION)

66.     Plaintiffs re-allege and incorporate by reference Paragraphs 1–51.

67.     Pursuant to the indemnification provision in the Avgas Contract attached as Exhibit F, the United States has a duty to indemnify the Oil Companies for investigation and remediation costs incurred by reason of production of avgas. The Federal Circuit concluded such duty exists in its interpretation of an identical provision in a different wartime avgas contract involving a different Union refinery, as well as similar wartime avgas contracts with other refiners. *See Shell Oil Co.*, 896 F.3d at 1316; *Shell Oil Co.*, 751 F.3d at 1296. Under this binding precedent, the United States must indemnify the Oil Companies for 100 percent of the remediation costs that they have incurred as a result of their respective periods of performance under the Avgas Contract, plus 2.5 percent simple interest running until the date of payment.

68.     Union or its predecessor-in-interest has incurred and will continue to incur investigation and remediation costs at Smith's Bluff in response to state and federal directives, and interest will continue to accrue on those costs until paid.

69.     The United States, through the DSC's successor-in-interest, the GSA, has failed to honor its indemnification obligations to Union, Pure Oil Company's relevant successor-in-interest.

70.     Union or its predecessor-in-interest fully performed its duties under the Avgas Contract. The only remaining relevant duties of performance under the Avgas Contract are the duties of the United States to indemnify Union for investigation and remediation costs incurred by reason of the production, manufacture, sale, or delivery of the commodities delivered under the Avgas Contract.

71.     The United States' failure to indemnify Union for such costs and interest materially breaches the Avgas Contract, and Union is entitled to recover in damages all investigation and remediation costs and interest that it claims from the United States.

72.     Union is also entitled to recover "reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract," 41 U.S.C. § 106(d)(3) (2010), plus 2.5 percent simple interest running until the date of payment.

## PRAYER FOR RELIEF

73.     WHEREFORE, the Oil Companies respectfully request that this Court enter judgment:

    a.      Awarding the Oil Companies damages in the amount of at least $65 million, allocated as follows:

        i.      Chevron (23.08 percent):                    $15,002,000

        ii.     Texaco Downstream (72.31 percent):           $47,001,500

        iii.    Union (4.61 percent):                        $2,996,500

b. Awarding any additional remediation costs that the Oil Companies incur before trial by reason of the production, manufacture, sale, or delivery of the commodities delivered under the Avgas Contracts;

c. Awarding the Oil Companies 2.5 percent simple interest on all investigation and remediation costs that they have incurred or will incur before trial by reason of the production, manufacture, sale, or delivery of the commodities delivered under the Avgas Contracts, the amount of which will be determined at trial and which will continue to run until the date of payment by the United States;

d. Awarding the Oil Companies "accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract" in the amount of $2 million;

e. Awarding the Oil Companies their costs, interest, and attorneys' fees as allowed by law;

f. Ordering such other relief as this Court may deem just and proper.

Dated: December 7, 2020

*Of counsel*:

Vincent J. Colatriano
Shelby L. Baird
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
vcolatriano@cooperkirk.com
sbaird@cooperkirk.com

Respectfully submitted,

s/ Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
mkirk@cooperkirk.com

Christopher H. Marraro
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
(202) 861-1500
(202) 861-1783 (fax)
cmarraro@bakerlaw.com

Bridget S. McCabe
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
(310) 820-8800
(310) 820-8859 (fax)
bmccabe@bakerlaw.com